**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION**

**JUANTRELL HARRIS**                                                                                 **PLAINTIFF**

**V.**                              **CASE NO.: 2:13CV00014 BD**

**CAROLYN W. COLVIN, Acting Commissioner,
Social Security Administration[1]**                                                              **DEFENDANT**


**MEMORANDUM OPINION AND ORDER**

Plaintiff Juantrell Harris appeals the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act (the "Act"). For reasons set out below, the decision of the Commissioner is AFFIRMED.

**I.     Background**

On June 1, 2004, Mr. Harris protectively filed for SSI, alleging disability beginning on January 1, 1992, due to a mental disorder. (Tr. 79-80) Mr. Harris's claims were denied initially and upon reconsideration. At his request, an Administrative Law Judge ("ALJ") held a hearing on August 16, 2006. The ALJ issued a decision on November 21, 2006, finding Mr. Harris not disabled under the Act. (Tr. 10-19)

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration. She has been substituted for named Defendant Michael J. Astrue under Fed.R.Civ.P. 25.

On August 27, 2009, the United States District Court for the Eastern District of Arkansas remanded the case to the Commissioner.  An ALJ held a second hearing on April 13, 2010, and on May 28, 2010, issued another decision finding Mr. Harris not disabled.  (Tr. 206-216)

On January 22, 2011, the Appeals Council remanded the case to the ALJ to obtain additional evidence regarding Mr. Harris's intellectual functioning, specifically related to malingering.  (Tr. 198-202)  A third hearing was held on June 22, 2011.  (Tr. 279-300)  After receiving the results of additional testing, the ALJ issued a decision on December 9, 2011, again finding that Mr. Harris was not disabled under the Act.  (Tr. 185-197)  On December 15, 2012, the Appeals Council declined to assume jurisdiction of Mr. Harris's case, making the ALJ's December 9, 2011 decision the Commissioner's final decision. (Tr. 171-174)

Mr. Harris was 31 years old at the time of the third hearing.  (Tr. 285)  He lived with his grandmother.  Mr. Harris testified that he was in regular classes in school and did not receive any special services, but did not graduate high school.  (Tr. 286)  Mr. Harris could take care of his personal needs.  (Tr. 291)  He could also go to the grocery store with a list, select the listed groceries, and confirm he received correct change.  (Tr. 287)

## II.    Decision of the Administrative Law Judge

The ALJ followed the familiar five-step process in analyzing Mr. Harris's application.[2]  He found that Mr. Harris had not engaged in substantial gainful activity since the date of his application for SSI.  (Tr. 187)  And he found that Mr. Harris had the following severe impairments: borderline IQ and personality disorder with antisocial features.  (Tr. 187)  The ALJ also found that Mr. Harris did not have an impairment or combination of impairments meeting or equaling an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 416.926).  (Tr. 187-191)

The ALJ determined that Mr. Harris had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the following nonexertional limitations:  He could apply commonsense understanding to carry out simple one-to-two step instructions, deal with standardized situations with few to no variables, read or write a simple message such as instructions or inventory lists, and have no more than occasional interaction with supervisors and coworkers and none with the general public.  (Tr. 191-196)

---

[2] The ALJ followed the required sequential analysis to determine: (1) whether the claimant was engaged in substantial gainful activity; (2) if not, whether the claimant had a severe impairment; (3) if so, whether the impairment (or combination of impairments) met or equaled a listed impairment; and (4) if not, whether the impairment (or combination of impairments) prevented the claimant from performing past relevant work; and (5) if so, whether the impairment (or combination of impairments) prevented the claimant from performing any other jobs available in significant numbers in the national economy. 20 C.F.R. § 416.920(a)-(g) (2005).

Mr. Harris had no past relevant work. (Tr. 196) After considering VE testimony, the ALJ determined that Mr. Harris could perform significant numbers of jobs existing in the national economy. (Tr. 196-197) Accordingly, the ALJ found that Mr. Harris was not disabled. (Tr. 197)

### III. Analysis[3]

    A. *Plaintiff's Arguments for Reversal*

Mr. Harris claims that the ALJ's decision at step five was not supported by substantial evidence because: (1) the ALJ erred in finding Mr. Harris suffered from borderline intellectual functioning, instead of mild mental retardation; and (2) the ALJ's reliance on the evidence in the record was misplaced. (#12)

    B. *Step five*

At step five of the sequential analysis, the Commissioner bears the burden of establishing that there are a significant number of jobs available in the national economy which a claimant can perform. *Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006). The ultimate burden of persuasion, however, still rests with the claimant. *Charles v.*

---

[3] The standard of review in this case is whether there is substantial evidence in the record as a whole to support the decision. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011); 42 U.S.C. § 405(g). Substantial evidence is "less than a preponderance, but sufficient for reasonable minds to find it adequate to support the decision." *Id*. (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)). In reviewing the record as a whole, the Court must consider both evidence that detracts from the Commissioner's decision and evidence that supports the decision; but, the decision cannot be reversed, "simply because some evidence may support the opposite conclusion." *Id*. (citing *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006)).

*Barnhart*, 375 F.3d 777, 782 n. 5 (8th Cir. 2004). What a claimant proved as his or her RFC at step four remains the RFC at step five. Only the burden of production shifts to the Commissioner. *Id*.

In this case, VE testimony identified a significant number of jobs in the national economy that Mr. Harris could perform. (Tr. 297-298) VE testimony constitutes substantial evidence when in response to a hypothetical that captures all the concrete consequences of a claimant's impairments. *Buckner v. Astrue*, 646 F.3d 549, 561 (8th Cir. 2011).

    C.    *Mental Impairments*

Mr. Harris argues that he suffered mild mental retardation, instead of borderline intellectual functioning, as found by the ALJ. (#12) Regardless of the label given to Mr. Harris's intellectual impairment, substantial evidence supports the ALJ's finding.

On August 5, 2004, Mr. Harris underwent a mental status evaluation performed by Nancy Toombs, Ph.D. (Tr. 85-89) Dr. Toombs also administered a WAIS-III IQ test. (Tr. 87-88) Mr. Harris scored a full scale IQ of 54, which Dr. Toombs concluded was a "gross underestimate of [Mr. Harris's] abilities." (Tr. 88) Dr. Toombs determined that the IQ scores were invalid due to Mr. Harris's very poor effort. (Tr. 87-88) This was the only IQ test in the record before the District Court when the Court remanded this case in 2009. *Harris v. Astrue*, Case No. 2:08CV00044, docket entry #13 (E.D.Ark. August 27,

2009).  Dr. Toombs ultimately diagnosed Mr. Harris as "borderline intellectual functioning versus mild mental retardation."  (Tr. 88)

The District Court remanded this case for the ALJ to have a qualified expert fully evaluate Mr. Harris's IQ.  *Harris v. Astrue*, Case No. 2:08CV00044, docket entry #13 (E.D.Ark. August 27, 2009).  The Court noted, in italics for emphasis, that counsel "*should carefully explain to Plaintiff the importance of his giving good effort and fully cooperating in the administration of this IQ test.*"  *Id*. at p. 12.  The Court cautioned that if Mr. Harris again displayed poor effort in taking his IQ test, the Court may "very well view the facts much differently in an appeal from another adverse decision."  *Id*. at p. 12.

After remand, Mr. Harris underwent two additional IQ tests and a Computerized Assessment of Response Bias ("CARB").  A separate medical expert also gave an opinion after reviewing the records.  Mr. Harris again displayed poor effort and failed to cooperate.

On December 7, 2009, Mr. Harris underwent a consultative examination performed by William B. Little, Ph.D.  (Tr. 246-257)  Dr. Little administered two IQ tests, the WAIS-III and the WIAT-II.  Mr. Harris displayed an extremely low range of intellectual functioning, though Dr. Little cautioned that the results were "likely a significant underestimate of [Mr. Harris's] intellectual potential."  (Tr. 243)  Dr. Little questioned the validity of the scores due to minimal effort and malingering.  (Tr. 248,

254) He noted Mr. Harris's presentation was suggestive of an individual functioning in the high mild to borderline range. (Tr. 253)

On January 9, 2010, Barbara J. Felkins, M.D., reviewed the medical records at the request of the ALJ. (Tr. 258-265) Dr. Felkins thought Mr. Harris suffered from borderline intellectual functioning. (Tr. 260, 263) She noted conflicts in the record due to Mr. Harris's lack of cooperation. (Tr. 260) Dr. Felkins stated that Mr. Harris had never cooperated with an assessment or treatment, including a basic medical exam. (Tr. 262)

On March 11, 2011, Dr. Toombs performed another mental diagnostic evaluation on Mr. Harris. (Tr. 269-275) Dr. Toombs stated she was unable to make an assessment regarding depression because Mr. Harris was uncooperative. (Tr. 272) Dr. Toombs again noted very poor effort, but thought the lack of cooperation was part of Mr. Harris's personality disorder, not malingering. (Tr. 273-274) She suspected Mr. Harris's IQ would fall in the borderline range. (Tr. 273)

After the third administrative hearing, the ALJ sent Mr. Harris for a post-hearing assessment. (Tr. 299) On November 3, 2011, Sam Boyd, Ph.D., administered a CARB to judge Mr. Harris's effort. (Tr. 276-278) The result was consistent with incomplete effort. (Tr. 277) An individual with a severe brain injury would be unlikely to perform as poorly as Mr. Harris did in the absence of symptom exaggeration or malingering. (Tr.

277) Dr. Boyd noted that Mr. Harris may conduct his life in that manner, without putting forth much effort into anything. (Tr. 277)

The ALJ considered Mr. Harris's activities of daily living, social functioning, and difficulties in concentration, persistence, or pace. (Tr. 188) In his decision, the ALJ discussed the multiple consultive evaluations. (Tr. 189-191) The ALJ's mental impairment determination was supported by substantial evidence.

Dr. Toombs suspected Mr. Harris had borderline intellectual functioning in 2004. (Tr. 88) She found Mr. Harris was capable of communicating effectively, "more than capable of understanding instructions and directions," but noted that he probably would not get along with supervisors and coworkers. (Tr. 89)

Dr. Little could not draw any firm conclusions due to poor effort, but noted that Mr. Harris's presentation was suggestive of an individual functioning in the high mild to borderline range. (Tr. 253) Dr. Little was unable to comment on Mr. Harris's mental functioning due to his malingering and poor effort. (Tr. 253-257)

Dr. Felkins thought Mr. Harris suffered from borderline intellectual functioning. (Tr. 260) Dr. Toombs, after her second evaluation, again suspected Mr. Harris's IQ would fall in the borderline range. (Tr. 273)

Mr. Harris argues that "it is entirely possible that [his] lack of motivation on testing is the result of his impairments, not any attempt to exaggerate or deceive." (#12, at p. 14) Dr. Felkins stated that Mr. Harris basically refused to do anything, and that is

not necessarily a medical condition. (Tr. 263) Despite very poor effort that may be associated with Mr. Harris's personality disorder, Dr. Toombs suspected Mr. Harris would fall in the borderline range. (Tr. 273) Mr. Harris's poor effort did not preclude the ALJ from making impairment and RFC determinations; it simply made the determinations more difficult. It was Mr. Harris's burden to prove both the existence of impairments and his RFC. His poor effort during multiple evaluations, for whatever reason, did not shift the burden to the ALJ.

  D. *Evidence in the Record*

Mr. Harris argues that the ALJ's reliance on the evidence in the record was misplaced. (#12) It appears Mr. Harris is requesting remand for additional consultative evaluations. Should this Court remand this case a second time and again admonish Mr. Harris to put forth effort during additional evaluations?

Dr. Toombs thought in 2004 that retesting Mr. Harris would not be of much benefit because he would not put forth the effort to get an accurate result. (Tr. 89) Dr. Felkins stated that Mr. Harris had never cooperated with an assessment or treatment. (Tr. 262) After the District Court admonished Mr. Harris to put forth effort on testing, Dr. Little found that Mr. Harris gave marginal effort. (Tr. 248) CARB results also showed that Mr. Harris gave less than full effort. (Tr. 277) The Commissioner gave Mr. Harris multiple opportunities to put forth effort during one of his multiple evaluations. The record shows that additional evaluations would be of little use.

Mr. Harris argues that the records are inconsistent regarding whether he was malingering or just giving poor effort. (#12, p. 15) This is a nonissue. Regardless of whether or not Mr. Harris was intentionally malingering or just naturally giving poor effort, every report consistently notes his IQ scores underestimated his intelligence.

Mr. Harris also argues that Dr. Toombs first found that he was "likely mentally retarded" then stated he had borderline intelligence. (#12, pp. 15-16) In her first evaluation, Dr. Toombs found borderline intellectual functioning versus mild mental retardation. (Tr. 88) She was unable to make a determination due to possible malingering, but definite poor effort. (Tr. 88-89) In her second evaluation, Dr. Toombs noted that Mr. Harris was again uncooperative, but not intentionally malingering. (Tr. 272-273) Mr. Harris again put forth very poor effort. (Tr. 274) She suspected Mr. Harris would fall in the borderline range. (Tr. 273) Consistent with Dr. Toombs's evaluations, Dr. Boyd noted Mr. Harris gave poor effort, but was not blatantly malingering. (Tr. 277) Dr. Little said Mr. Harris gave marginal effort. (Tr. 248) There is no inconsistency here that would justify remand.

IV. **Conclusion**

The Court has reviewed all of the evidence in the record. Despite his impairments, there is sufficient evidence in the record as a whole to support the Commissioner's determination that Juantrell Harris retained the residual functional capacity to perform jobs existing in significant numbers in the economy.

Accordingly, his appeal is DENIED, and the Clerk of Court is directed to close the case, this 8th day of November, 2013.

_____
UNITED STATES MAGISTRATE JUDGE